```
 1              UNITED STATES DISTRICT COURT

 2        WESTERN DISTRICT OF WASHINGTON AT TACOMA

 3   _____
                                )
 4   UNITED STATES OF AMERICA,   )
                                 )  CR23-5326-BHS
 5              Plaintiff,       )
                                 )  Tacoma, Washington
 6     v.                        )
                                 )  November 18, 2024
 7   SCHYLAR COLFAX,             )  10:45 a.m.
                                 )
 8              Defendant.       )  Sentencing
                                 )
 9   _____

10           VERBATIM REPORT OF PROCEEDINGS
         BEFORE THE HONORABLE BENJAMIN H. SETTLE
11            UNITED STATES DISTRICT JUDGE
     _____

12


13

     APPEARANCES:
14

15    For the Plaintiff:     MICHAEL F. HARDER
                             CELIA A. LEE
16                           U.S. Attorney's Office
                             700 Stewart St., Suite 5220
17                           Seattle, WA 98101

18

19    For the Defendant:     PHIL I. BRENNAN
                             P.O. Box 20432
20                           Seattle, WA 98102

21                           NATALIE FINDLEY-WOLF
                             Findley-Wolf Law
22                           631 Strander Boulevard, Suite G
                             Tukwila, WA 98188

23


24

25       Proceedings stenographically reported and transcript
            produced with computer-aided technology
```

1              NOVEMBER 18, 2024 - MORNING SESSION

2                   * * * * * *

3        THE DEPUTY CLERK:  This is the matter of United

4    States of America versus Schylar Colfax, Cause Number

5    CR23-5326-BHS.

6      Counsel, please make an appearance for the record.

7        MS. LEE:  Good morning, Your Honor.  Celia Lee and

8    Michael Harder on behalf of the United States.

9        THE COURT:  Good morning.

10        MR. BRENNAN:  Good morning, Your Honor.  Phil Brennan

11    and Natalie Findley-Wolf for Mr. Colfax.

12        THE COURT:  Good morning.  This matter comes before

13    the Court for sentencing.  The first thing I want to do here

14    is inquire of Mr. Colfax if you remain satisfied with the

15    services you've been receiving from your attorneys here.

16        THE DEFENDANT:  Yeah, yes.

17        THE COURT:  Follow-up question, then, is have you had

18    time, do you believe, to prepare for this hearing by

19    reviewing with them the Presentence Investigation Report, as

20    well as the sentencing memoranda that were filed, one by the

21    government and one your attorneys filed on your behalf?

22    There was a victim statement filed of late.  Have you been

23    able to review these things with them and prepare for this

24    hearing?

25        THE DEFENDANT:  Yes.

1    THE COURT:  All right.  I have reviewed those as
2    well, and in addition, the plea -- I'm sorry -- the
3    sentencing recommendation of the probation officer and the
4    declaration of your attorney, Mr. Brennan, with the
5    attachment.
6        Are there any other documents I need to review here?
7        MS. LEE:  Not from the government, Your Honor, no.
8        MR. BRENNAN:  No, Your Honor.
9        THE COURT:  All right.  I won't hear from the
10   government until I review what the sentencing parameters are
11   here.  Count 1 is abusive sexual contact, which is a Class E
12   felony and carries a two-year maximum sentence.  The parties
13   are in accord that the count here, Count 1, has a base
14   offense level of 12.  One criminal history point puts him in
15   the criminal history category of I, and so the guidelines
16   would be 10 to 16 months.  These are not binding upon the
17   Court, but that is what the guidelines would indicate here.
18       The parties are in accord with the sentencing parameters
19   here I've outlined?
20       MS. LEE:  Yes, Your Honor.
21       MR. BRENNAN:  Yes, Your Honor.
22       THE COURT:  Now I will hear from the government on
23   its recommendation.
24       MS. LEE:  Thank you.  Thank you, Your Honor.
25       Before I begin, I do want to acknowledge a number of

1  people that are present in court, including the lead case

2  agent, FBI Agent Ted Halla; the victim, A.T.; as well as

3  Maria Secor.  I believe that A.T. and Ms. Secor may wish to

4  address the Court at the appropriate time.

5      I acknowledge them and their presence here, because trial

6  was particularly difficult.  As this Court knows from

7  Amnesty's letter, she described testifying before this Court

8  and before this defendant as "horrible," but she is here to

9  see this process through.  She's missing school today, and I

10 want to take a moment to acknowledge her bravery through this

11 process and today.

12     Your Honor, the government concurs with the U.S. Probation

13 Office's calculation of the offense level, as the Court has

14 already articulated, and the government also agrees with U.S.

15 Probation that a sentence above the guidelines range is

16 appropriate.  All of the facts support that this was an

17 aggravated case and aggravating facts that warrant the

18 statutory maximum of 24 months.

19     Before I continue, I want to address the conditions that

20 probation is recommending.  The government agrees with the

21 conditions that the U.S. Probation Office is asking this

22 Court to impose.  We would join in the recommendation for a

23 sexual-deviancy evaluation.  Although one was provided as a

24 sealed exhibit to this Court, in the government's view, it's

25 woefully inaccurate, and it's based upon incorrect facts.

1     Most importantly, that evaluation doesn't refer to the

2     evidence that this Court heard as to planning and

3     premeditation and evidence that this Court admitted under

4     404(b) that showed that there was a history, albeit one prior

5     time, where the defendant inappropriately touched A.T.  And I

6     think that many of the conclusions that that evaluator

7     reaches flow from that mistake as it relates to facts.

8         Additionally, the government is asking the Court at this

9     time to impose no contact with minors.  The defendant denies

10    the offense, as far as the government can tell, and if he

11    committed the offense, based on the evaluation, it seems that

12    it was because he was under the influence of drugs.

13        Now, the government is concerned not just for young teen

14    girls, but of any child if the defendant behaves sexually in

15    this manner when he's under the influence of drugs.  So the

16    government, at this time, is asking the Court to impose no

17    contact with minors.

18        If the Court is inclined to carve out a provision for

19    contact, the government would ask that the Court only carve

20    out a provision that he have supervised contact with his own

21    biological children.  The Court heard of one of those

22    children, Gregory, who I believe is eight or nine years old

23    at this time, and he may have -- or there may be an infant

24    that was born over the past year.

25        The government is alternatively asking the Court to

1   consider whether it would be appropriate if the Court orders

2   a new sexual-deviancy evaluation for the evaluator,

3   considering a complete statement of facts, to assess whether

4   there are provisions under which the defendant can safely

5   have contact with minors, including his own children, and let

6   the evaluator inform this Court, the government, and

7   U.S. Probation as to what a certified treatment provider

8   recommends in terms of contact.  The government is urging the

9   Court to impose both of those conditions as outlined by

10  U.S. Probation.

11      Your Honor, turning next to the 3553 factors, I want to

12  talk about the nature and circumstances of the offense.

13  Although trial was two months ago, I know that this Court

14  remembers this case, and particularly the victim's testimony,

15  because it was so painful.  And as she told this Court, it

16  was horrible, and we all saw how horrible that it was over

17  the course of her testimony during two days.

18      And her experience was horrible because the defendant's

19  conduct was horrible.  This was a sexual assault that took

20  place in, really, the one place any child should feel safe:

21  in their own home, in their own bed.  It happened in the

22  middle of the day, surrounded by protective adults, and in

23  that way, this was brazen.

24      As this Court knows, although the sexual-deviancy

25  treatment provider did not, the defendant's conduct is his

1    planning and intent.  The defendant had gone into her room

2    before, offering her a pile of worthless rocks, and took that

3    opportunity, alone, when there were other adults in the

4    house, to touch her inappropriately.  And he did it again,

5    because he knew he could do it, because he wanted to do it.

6    The defendant knew that, even in this small house with

7    trusted adults, he could be alone with this young girl.

8        On the date of the act, he knew how old she was, and he

9    didn't care that she was just 13.  He didn't care that she

10   was sick, and he didn't care that the family trusted him.  He

11   did what he wanted to do, something he'd done before, and he

12   took it further.

13       This Court heard that Amnesty, despite feeling sick and

14   feeling afraid, had the presence of mind to say "No" and to

15   try to stop him.  He didn't listen, and he may have been

16   high, but he also didn't care.

17       Moreover, I think this is so critical for everyone in this

18   room to consider, this was an assault, a sexual assault, that

19   was interrupted.  This was ongoing, and it only stopped when

20   protective adults stopped the defendant.  How far would the

21   defendant have taken this had he not been interrupted?

22       The government agrees with what Ms. Secor said, that the

23   defendant will continue to be a significant threat to the

24   community.  Any young girl is in danger of being victimized

25   as long as Schylar is allowed to live within the boundaries

1    of the reservation.

2        I want this Court to also consider -- I want to highlight

3    the fact that Amnesty described this as the second-lowest

4    point in her entire life, other than the death of her best

5    friend, this experience of what the defendant did to her.

6    The defendant's actions are aggravating, and I want the Court

7    to also consider the fact that the victim's age is

8    aggravating in the scope of the statute.  Thirteen is as

9    young as you can be to commit this offense, and if you're 12,

10   it's a much more serious offense.  It's aggravating that she

11   was sick.  It's aggravating that he's a trusted adult, and

12   it's aggravating that it was a prolonged act.

13       I want to turn now to the defendant's personal history and

14   characteristics.  As the Court knows, the defendant, like the

15   victim, is a member of the Makah Indian Tribe.  He grew up in

16   an intact home and graduated from high school with honors.

17   He has an ACEs score of one.  And while he claims his parents

18   may not love him and he does not have the best relationship

19   with them, he's had the support of an intact family who

20   provided him a place to live on their property.

21       Not only did the defendant have parents who provided for

22   him and cared for him on some level, but he had a community

23   who cared for him.  He had this family who cared for him and

24   acted to foster a relationship with his son.  He had a whole

25   community that supported him in many different ways.  They

1    put trust in him, and he abused that trust, and he fails to

2    take responsibility for his actions that have brought him

3    here today.

4        Now, in terms of the defendant, throughout the PSR and the

5    forensic risk evaluation dated August 18th, there's a common

6    theme that the government has seen, and that is a refusal to

7    take responsibility in, really, all aspects of his life.  He

8    says that he is fine, but he marries into dysfunctional

9    families.  Despite a very complicated life, including a

10   history of drug use and incarceration, he believes that he's

11   become enlightened.  He seems to believe that he, unlike his

12   wife, can use drugs and not hurt people, and yet we're here

13   for sentencing in a case of sexual touching of a child.

14       In terms of the forensic risk assessment that was filed

15   under seal, in the government's view, this Court should

16   largely discount many of that evaluator's conclusions,

17   because as I've stated before, it was based upon an

18   incomplete statement of facts, and the evaluation was

19   completed a month before trial.  The evaluation is predicated

20   almost entirely on Mr. Colfax's self-report.  It relies upon

21   an incomplete statement of facts that omits evidence of

22   planning and premeditation.

23       The defendant's drug use, while the evaluator concludes

24   that it is mitigating, in the government's view, it is

25   aggravating.  It's aggravating because he uses drugs when

1   he's around children, and as this Court -- at least as the

2   parties knew -- it was excluded at trial -- he was almost

3   always under the influence of drugs when he was around his

4   own son and when he was around people in this community, and

5   that is his fault and his fault alone.  This is who he chose

6   to become.  This is how he chose to behave, and it is the

7   defendant and the defendant alone who's responsible for this

8   conduct, whether he was high or not.

9       Your Honor, I want to turn, finally, to promoting respect

10  for the law, just punishment, and affording adequate

11  deterrence to criminal conduct.  The government, as I've said

12  before, agrees that a sentence above the guidelines is

13  appropriate and necessary to accomplish the goals of

14  sentencing and to provide for safety of the community.  Here,

15  there is an obvious and compelling justification for

16  punishment in that the defendant exploited his access to the

17  victim, legally, his stepchild, a 13-year-old girl.

18      In light of the conduct, a sentence of 24 months, albeit

19  the statutory maximum, is appropriate given the lifelong

20  impact on the victim and their tightly-woven community.  When

21  a defendant commits a crime like this, a sexual offense

22  against a child, it has a ripple effect.  It's not just the

23  two people in this room.  It spreads.  It's going to affect

24  the defendant's own child, Gregory, who doesn't get to see

25  his father.  It's going to affect Amnesty and her family for

1   many, many years to come.

2       Such a sentence of 24 months will promote respect for the

3   law.  It would be viewed by the community, the Makah Tribe,

4   as a just punishment, and it would also afford adequate

5   deterrence for deviant conduct involving sexual abuse of a

6   child in the future.

7       The defense asks this Court to impose the lowest sentence

8   possible without justification.  There is simply nothing

9   mitigating.  There is nothing mitigating about what the

10  defendant did that warrants credit for time served in this

11  case.

12      In conclusion, the government respectfully asks that this

13  Court impose a sentence of 24 months, followed by five years

14  of supervised release, because this sentence will protect the

15  public and the victim for the maximum term.  Moreover, there

16  are simply no mitigating circumstances that warrant anything

17  other than the maximum sentence.  If this Court weighs the

18  vulnerability of the victim in light of her young age, the

19  fact that she was ill, the fact that he was trusted as an

20  adult, all of those factors weigh heavily in favor of

21  24 months, and the government respectfully asks the Court to

22  impose it.

23      At this time, I would ask that the Court hear from

24  Ms. Secor, who would like to address the Court.

25          THE COURT:  Yes, she may.

 1    MS. SECOR:  Good morning, Your Honor.

 2    THE COURT:  Good morning.  If you'd state your full

 3  name for the record.

 4    MS. SECOR:  Maria Secor.  This case has been really

 5  hard on our whole family.  Like, it's been mentioned that

 6  Amnesty and her little brother live with us, and we did

 7  invite Schylar into our family and into our home so he could

 8  visit with his son, and that was the biggest mistake that we

 9  could have made.  We didn't know that this would happen, but

10  it's impacted not only Amnesty, but her little brother.  He

11  is nine years old and does not understand why his father hurt

12  his little sister.  He doesn't understand why he's gone from

13  his life and how long he'll be gone, and none of us know

14  that.

15    It's been really hard to see how this has affected my

16  granddaughter.  She's always been an honor student, and that

17  didn't change, but there have been changes in her

18  personality.

19    I just hope that, in some way, somehow, he will get

20  treatment or whatever it is he needs to do so that someday he

21  can be around his son.  I don't know, but it's been really,

22  really -- you trust someone, and you let them into your

23  family, and it's the betrayal that has been so hard.  We just

24  wanted him to be able to have a relationship with his son,

25  and he hurt my granddaughter really bad, and it's just so

1   wrong.

2       I just wanted you to know how bad it's affected the entire

3   family.  It's caused pain to my mother, my sister, everyone

4   that was there that day when it happened.  And I'm not sure

5   that that's the only time that this has happened, because

6   Amnesty has been around him since she was a toddler, you

7   know.  I'm just asking you to consider the kids and what he

8   has done to their lives.  Thank you.

9           THE COURT:  Thank you.

10          MS. LEE:  Your Honor, that concludes the Government's

11  sentencing presentation.  Thank you.

12          THE COURT:  Before I hear from Mr. Brennan, anything,

13  Ms. Neumeister, from probation?

14          MS. NEUMEISTER:  I don't believe so, Your Honor,

15  unless there are any questions.

16          THE COURT:  Not at this time.  Thank you.

17          MS. NEUMEISTER:  Thank you.

18          THE COURT:  Mr. Brennan.

19          MR. BRENNAN:  Thank you, Your Honor.  Your Honor, we

20  are asking for a sentence of time served, which is the

21  equivalent of 13 months of custody, one month being the time

22  he spent in Neah Bay and the 12 months he spent at SeaTac.

23  The government says we're asking for the lowest sentence

24  possible.  That's incorrect.  This would be a mid-range

25  sentence, and we think that's appropriate.

1    One thing I want to also point out -- the government is

2    mistaken.  It essentially throws out the report of

3    Dr. Geoffroy-Dallery because she was not aware of the prior

4    alleged contact.  I direct the Court's attention to page 2

5    and 3 of Dr. Geoffroy's report, and I am just going to read

6    it into the record.

7    It says -- the very last sentence says, on page 2, quote:

8    "After Mr. Colfax's departure, the victim disclosed what had

9    happened.  She later disclosed to investigators that he had

10   done some other uncomfortable things to her in the past,

11   always when away from other people."

12   The government's premise is that our expert is in the

13   dark, and that's simply not true, so we think this report is

14   quite valuable and quite helpful.

15   And by the way, I neglected to submit the CV of this

16   expert, but in showing the government this earlier this

17   morning, the government spent four years -- I'm sorry, the

18   expert spent four years at Western State dealing with sexual

19   predators.  Prior to that, her CV indicates that she spent --

20   I actually have it right here.  From October 2018 to

21   October 2019, she had a primary caseload of 30 patients, 100

22   patients a day -- a week, dealing with sexually-violent

23   predators, so she is very well-schooled in spotting sexual

24   deviancy and risk factors.

25   So, Your Honor, with regard to the factors that the Court

1    considers, there are a number of 3553(a) factors that balance

2    the Court's decision as to what an appropriate sentence is.

3    Mr. Colfax has a supportive family.  He certainly has strains

4    with his family with regard to his parents, but by and large,

5    they certainly love him, and I know he loves his parents, and

6    that's important for someone to have as far as a support

7    network.

8        He's also very close to his children, and he's a very

9    proud father, including, as we just talked about, with his

10   son, Gregory.

11       He has a lot of skills.  He's a fisherman.  He's also

12   somebody who knows how to cook, and he's smart.  He graduated

13   with high school honors and got into Seattle University,

14   which is a really good school and not easy to get into.

15       His criminal history indicates, in his four and a half

16   decades on this earth, he has not engaged in any prior sexual

17   crimes, so this was highly out of the ordinary.  What the

18   prior criminal history indicates is that he's had drug

19   problems, and as referenced in Dr. Geoffroy's report, the day

20   of the incident, he reported using drugs.

21       Now I want to talk a little bit about our expert's report,

22   Dr. Geoffroy-Dallery's report.  She indicated that his drug

23   use is a problem, and Mr. Colfax, as I mention in my

24   briefing, thinks that he does not have a problem, but we'll

25   be quite candid, our expert does.  He's had some drug

1    treatment in the past, and like a lot of folks that struggle

2    with drug addiction, sometimes there are relapses, and that's

3    something that can be addressed.

4        She does a bunch of assessments in terms of the tail end

5    of her report as far as what are the risk factors, what is

6    the likelihood that he's going to re-offend, and she has

7    various statistics in here, which I just jotted down a few of

8    them.  With regard to his risk score, there's an 85 to

9    95 percent likelihood that there's not going to be -- or

10   85 percent to 95 percent of people in similar situations do

11   not re-offend.  She says elsewhere in her report that 98 to

12   99 percent of folks do not re-offend in this situation.

13       Recall that she spent three hours evaluating him, and she

14   got a lot of the information that this Court heard at trial.

15   She got the police report; she witnessed the victim's audio

16   and video interview; and as mentioned, she was well aware of

17   the allegations of prior contact -- or prior incidents.  She

18   took all of that together, and based on her schooling and her

19   expertise, she concluded that Mr. Colfax is not likely to

20   re-offend.  That, I think, of course, is premised on his

21   sobriety.  What she essentially said in her report is that

22   you can let your guard down if you're high on drugs and you

23   can do things that you normally wouldn't do, in this case,

24   the abusive sexual contact at issue in this case.

25       The one word that pops out in her report is Mr. Colfax's

1  very basic response to the whole thought of engaging in

2  sexual improprieties.  He used the word "eww," as in E-W-W,

3  as in disgusting, and she considered that actually a relevant

4  factor in her assessment, because she saw no indication of

5  proclivity to engage in sexually-inappropriate behavior.

6      Dr. Geoffroy also recommended inpatient treatment, which

7  probation is recommending, and again, Mr. Colfax doesn't feel

8  he needs it, but Mr. Colfax also is going to do whatever this

9  Court instructs and is going to do it well.  The

10  recommendation from Dr. Geoffroy is a neurological evaluation

11  to deal with such things as ADHD, which seems to be a common

12  problem with people who like to use methamphetamine.  They

13  find it somehow soothing and/or helpful, and of course, it's

14  illegal and just the opposite.

15      So we think that this report actually supports what our

16  recommendation is, and the government hasn't produced a

17  contrary report, nor have they indicated specifically what

18  forensically is wrong with this report, other than its

19  premise that this expert did not have a full set of facts,

20  which is incorrect.

21      As far as the 3553(a) factors, this absolutely is a

22  serious crime, and we don't dispute anything that Ms. Secor

23  just said or that the victim said in the letter.  Nothing

24  more really needs to be said about that.  This is serious,

25  but Congress has decided that this is a crime that warrants a

1   maximum two-year sentence, not that Congress doesn't think

2   this is a serious crime, but in terms of calculating the

3   appropriate sentence, a maximum of two years indicates that

4   it is certainly less serious than other types of sexual

5   offenses.

6       Moreover, the Sentencing Guidelines has determined that

7   this type of crime typically warrants a sentence of somewhere

8   between 10 and 16 months.  Now, the government takes issue

9   with that sentence, suggesting that it is somehow outside of

10  the norm and/or inappropriate, but we think the Sentencing

11  Guidelines have calculated all types of offenses in factoring

12  this 10-to-16-month sentence.

13      In fact, the tail end of probation's report indicates that

14  the typical person that is convicted of this crime serves

15  anywhere between 8 and 10 months, again, indicating that,

16  absolutely, it's a serious crime, but it is not one that

17  warrants excessive amounts of jail time.

18      Suffice it to say that in virtually every one of these

19  cases there will be grooming, some type of grooming.  Very

20  rarely have I seen published cases where this is a one-time

21  offense and/or it happened out of the blue.  So when the

22  government suggests there's something aggravating about this

23  case or something unique about this case, I think that fails

24  to recognize what the typical case involves, and this conduct

25  really doesn't fall outside that norm.

1    As far as the history of Mr. Colfax, it seems to me, when

2  he's not on drugs, he's not going to commit crimes, and in

3  his four and a half decades on this planet, he's never

4  engaged in sexual deviant behavior and/or sexual misconduct.

5    As far as the punishment, the appropriate punishment, as

6  well as treatment, he has already served 13 months in prison.

7  And Ms. Secor just said a few minutes ago that she hopes he

8  gets some type of treatment, and that's, of course, a 3553(a)

9  factor.  The question is whether sending Mr. Colfax back to

10  the FDC to serve additional custodial time is going to

11  accomplish anything.  He's certainly not getting treatment

12  there, and he's not working towards building a path back to

13  society and, of course, engagement with his son and his

14  normal life.

15    As I mentioned, the guideline sentence is 10 to 16 months.

16  He's in Zone C, meaning that the typical defendant has at his

17  disposal serving half the time in custody, meaning if he were

18  to get, let's say, a 13-month sentence, he'd have to serve

19  six months, and he'd be, right now, serving the remaining six

20  months in a halfway house, if he's the typical defendant.  Of

21  course, he's served much more than that.

22    There's also a concern the Court has about disparity, and

23  again, the JSIN report calculates all different types of

24  individuals who have been convicted of this crime and

25  concludes, typically, they don't serve more than 8 or

20

1    10 months, and Mr. Colfax is already at month 13.

2         Probation recommends 18 months, and the government

3    recommends 24 months, but they really never explain why the

4    sentence in the Sentencing Guidelines is incorrect or wrong.

5    Certainly there are situations where folks can say, "Well,

6    your criminal history is underscored, and therefore, we need

7    to boost up your average."  That's not this case.  It's

8    simply a disagreement with both the congressional mandate of

9    two years and the Sentencing Guidelines, and I don't think

10    that is an appropriate reason to deviate from the sentencing

11    guideline range.

12         Moreover, probation's recommendation seems to be premised

13    on the theory that Mr. Colfax was in a caretaking and/or

14    stepfather-stepdaughter relationship, and that clearly is not

15    the case, as the trial indicated.  The victim in this case

16    did not consider him to be a father figure, and there's no

17    indication that he had any type of parenting role, whether in

18    her teen years or earlier in her youth.  In fact, the

19    testimony at trial was that she was raised mostly by her

20    grandmother, Ms. Secor.

21         Finally, Your Honor, the probation conditions.  I want to

22    point out, with regard to drug treatment, again, I feel

23    compelled to reference to the Court that, with regard to

24    Number 2 of the special conditions, inpatient treatment,

25    Mr. Colfax does not want that.  I realize that our expert is

1    advocating that and there's a long string of folks that think

2    he has a drug problem.

3        With regard to children contact, which is Special

4    Condition Number 9, there are multiple flaws with that.

5    Suffice it to say it's overbroad.  First of all, there's no

6    indication he's ever had any sexual misconduct with any male

7    figures or boys, so right off the bat, to take all children

8    and put them all in one category, I think, is overbroad.

9        Second of all, it fails to take into account that

10   Mr. Colfax has children, and particularly Gregory.  There's

11   never been an indication that he's engaged in any improper

12   conduct with his son, nor is there any suggestion that he

13   would do that.  Again, the government's position or request

14   that he be separated from his child unless a supervising

15   adult is there, I think, is impacting a very important

16   father-son bond, and there's no basis to support that.

17       The same holds true with his infant daughter, if it is, in

18   fact, his daughter.  There's no indication he's engaged in

19   any type of activity with toddlers.  Moreover, I think this

20   Court has at its disposal urinalysis testing and drug

21   testing, and again, as I said earlier, if he is sober, he's

22   not going to be engaging in this conduct.

23       Finally, with regard to the psychological evaluation --

24   that's Special Condition Number 8 -- we maintain that this

25   was a very thorough report.  Yes, it was done a month before

1   trial, but it was done with all the evidence, essentially,

2   that was brought forth at trial.  This expert has been around

3   quite a while and has seen a lot of people with

4   sexual-deviancy issues, and she has determined that he's not

5   a risk.

6        I would suggest, if the Court feels there's some

7   deficiency in this report -- for example, if the government

8   wants to present us or present the expert with additional

9   facts and/or a transcript of this prior alleged conduct -- we

10  can go back to this expert and have her pick up where she

11  left off.  I asked her if she'd be willing to do that, and

12  she said she would.  I don't think it's necessary, but rather

13  than reinvent the wheel and send him to somebody from

14  scratch, I think we could send him back to her and say,

15  "Okay, here are the extra facts you need to know.  Do you

16  have any disagreement?"

17       Certainly, the same holds true with regard to his ability

18  to access his children.  Quite confident this expert is going

19  to say he's got no problem as far as being with his son, but

20  to the extent that there's an impediment between him and

21  getting back to his normal life and the psychological report

22  is somehow deficient, we think that can be cured quite simply

23  with a very short supplemental evaluation with her.

24       So, Your Honor, we are asking for a sentence of what is

25  typical in these cases according to the JSIN statistics.  We

1   are asking for a sentence of time served, which is

2   essentially 13 months of actual time and, indeed, really

3   15 months if you consider the good-time credit he has earned

4   based on his excellent behavior at SeaTac and having been

5   there more than 12 months and a day.  I think "time served"

6   is an easier way to do this rather than getting involved in

7   the calculations.

8       Of course, the Court has to decide what happens once he's

9   finished with his time.  Does he go to inpatient?  That's

10  certainly one option.  The other option would be for him to

11  be released and just find suitable housing, which is what I

12  think he prefers, whether that would be something like the

13  Oxford House, which is sober housing back in Port Angeles, or

14  a halfway house.  That's something the Court can impose, but

15  I guess, of the layers of possibilities, one is inpatient,

16  the second one is a halfway house, and the third is just to

17  release him to simple housing, and we would ask for that

18  third option.  Thank you, Your Honor.

19          THE COURT:  Thank you.

20      Mr. Colfax, you have an opportunity to address the Court

21  here before sentence is imposed.  It's not required, but you

22  are welcome to, if you wish.

23          THE DEFENDANT:  No, Your Honor.

24          THE COURT:  When one appears before me for

25  sentencing, most cases are ones in which the defendant

1    appears before me after having pled guilty.  A few come

2    before me as you are, after a trial.  I point that out

3    because it gives me an opportunity to know in much greater

4    detail the nature of the offense, having sat through the

5    trial.

6         In looking at the 3553(a) factors, the seriousness of the

7    offense is, in this case, hard to minimize or undervalue when

8    you have someone who has been dramatically affected by this

9    incident that occurred and for which you've been found guilty

10   by a jury.  The statement that she submitted to the Court

11   demonstrates and reflects that seriousness.  This is leaving

12   a great impact on her presently.  She says she couldn't sleep

13   for days.  Clearly, this has affected her trust in people

14   that she thought she could trust, and so she'll be living

15   with this, really, for the rest of her life.  We all hope

16   that she is able to secure good counseling to address the

17   emotional and mental trauma that this created, but this was a

18   serious offense.

19        When I look at the need to protect the public, it is hard

20   to tell, at this point, what is necessary to protect the

21   public.  We know this much, and that is that you have a

22   history of substance use disorder and that, even by the

23   evaluation and by your own statements, this contributed to

24   your willingness to defy the rights of a young girl.

25        So there is a need in sentencing to protect the public,

1    but when we are looking at a maximum of two years versus a

2    recommendation for time served, which amounts to 13 months,

3    whatever this Court does within that, the fact is, you will

4    be back in the public and no longer being confined, but the

5    Court will be addressing that through supervised release.

6        The need to deter others is clearly an objective of the

7    3553(a) factors, deterring you and deterring others, a

8    general deterrence.

9        The Court is also to consider your personal

10   characteristics.  You have virtually no criminal history, at

11   age 47 -- certainly, only one point that is scored here --

12   and otherwise, you've generally led a productive life.

13       The Court read, of course, the evaluation by Dr. Geoffroy,

14   and her assessment at this point is that you are at a very

15   low risk for re-offending, but all of that is somewhat

16   qualified by the fact that you are also in need of substance

17   use disorder treatment, and I have a concern here in terms of

18   your full acceptance of responsibility for this offense and

19   for the recognition that your substance use disorder can be a

20   factor in whether or not you are a danger to the public.

21       As was pointed out by the government, there is a two-year

22   maximum sentence here, and as pointed out by Mr. Brennan.  In

23   addition, I've characterized this as a serious offense,

24   because this has had a serious impact on an entire family.

25   Congress puts the maximum at two years, and so a two-year

1    sentence should be reserved for the most aggravating of

2    circumstances, and I can't find that this is among the most

3    aggravating of circumstances.

4         Now, looking at the factor that we shouldn't be imposing

5    sentences that are significantly different for folks who have

6    committed similar offenses and have similar backgrounds,

7    Mr. Brennan has pointed to a study that was done by the

8    Administrative Office of the Courts that shows a sentence of

9    below a guideline-range sentence.

10        Many times, I hear the defense saying the Court should not

11   even look at these statistics, but one thing I can say with

12   probability, without having to view the cases evaluated, is

13   that most of them were probably cases in which the defendant

14   pled guilty, accepted responsibility, and that certainly is a

15   positive factor for sentencing that is not available here.

16   There has not been a plea where there has been an acceptance

17   of responsibility.

18        The Court is going to impose a mid-range sentence, because

19   I believe it's a mid-range guideline sentence that is what is

20   appropriate here of 14 months, followed by five years of

21   supervised release.

22        Now, you'll have all the standard conditions and mandatory

23   conditions.

24        Mr. Brennan, have you reviewed those with your client?

25             MR. BRENNAN:  Yes, Your Honor.

1    THE COURT:  And you've reviewed all the special

2    conditions, of course, including the ones that were proposed

3    here?

4    MR. BRENNAN:  I did, Your Honor.

5    THE COURT:  Well, I'm going to address some of these

6    concerns.  First, with respect to Number 5, restitution, has

7    there been a restitution amount requested?

8    MS. LEE:  Not yet, Your Honor, but the government is

9    requesting a date.

10    THE COURT:  Restitution will be required in an amount

11    to be determined by the Court, and we will need a date out.

12    THE DEPUTY CLERK:  Your Honor, we have January 27th

13    at 9:30 available.

14    THE COURT:  All right.  And is that going to work for

15    counsel?

16    MR. HARDER:  Yes, Your Honor.

17    MR. BRENNAN:  Yes, Your Honor.

18    THE COURT:  Then, of course, Mr. Colfax has a right

19    to be there.  He can waive that right, but that's up to him.

20    MR. BRENNAN:  I talked with him about this earlier,

21    Your Honor, and he waives his presence at that hearing.

22    THE COURT:  All right.  The Court is going to impose

23    the condition regarding substance abuse in Numbers 1 and 2.

24    That means that he must successfully complete an inpatient

25    treatment program.  That's been objected to, but there seems

1   to be more than ample justification for that requirement

2   here.

3        The other recommended -- Numbers 3 and 4, with regard to

4   4, he shall not have direct or indirect contact with the

5   victim by any means, including in person, by mail, electronic

6   means, or via third party without the approval of the

7   probation office.  If any contact occurs, he shall

8   immediately leave the area and contact his probation officer

9   within one business day.

10       Paragraph 6 is requiring and will require periodic

11  polygraph testing at the discretion of the treatment provider

12  as a means to ensure that he is in compliance with

13  requirements of his treatment program.  Polygraph testing may

14  not exceed six tests per year.

15       The Court adopts paragraph 7 with respect to requiring

16  registration as a sex offender.

17       With regard to eight, the defendant shall participate in a

18  sexual-deviancy evaluation conducted by a sexual-deviancy

19  treatment provider, which may be Dr. Geoffroy-Dallery, as

20  determined by the probation office, and of course, that means

21  that the evaluation may satisfy this requirement if the

22  probation officer determines that Dr. Geoffroy-Dallery is an

23  acceptable treatment provider for sexual deviancy.

24       With regard to Number 9, he shall not have any contact

25  with children under the age of 18, if recommended by his

1    sexual-deviancy provider.

2        So what I expect here, Officer Neumeister, is some

3    exchange and interaction with the -- again, if probation is

4    satisfied with Dr. Geoffroy-Dallery, then working out a

5    restriction with respect to children that is consistent with

6    her input.

7            MS. NEUMEISTER:  Yes, Your Honor.

8            THE COURT:  There's no ability to pay a fine, but a

9    special assessment of $100 is required.

10       I will hear from the parties as to the Court's

11   modifications of the proposed conditions.

12           MS. LEE:  Yes, Your Honor.  May I interlineate as to

13   Condition Number 8 that the U.S. Probation Office can

14   determine if the sexual-deviancy evaluation by this provider

15   is sufficient?

16           THE COURT:  That's what I intended.

17           MS. LEE:  All right.  Then, turning to Condition

18   Number 9, as it stands now, should the condition read:  "The

19   defendant shall have no contact with any children under the

20   age of 18 unless accompanied and supervised by an adult"?

21   Should it read as that, and then it can be readdressed in the

22   future?

23           THE COURT:  Right, that's better language.  It needs

24   to be language that this restriction is subject to the review

25   and recommendation to the probation officer by the

1    sexual-deviancy provider.

2         MS. LEE:  Okay.  Then, the last issue that I want to

3    -- in light of thinking about these conditions, is that

4    there's going to need to be some coordination and contact

5    between the defendant, his counsel, probation, and

6    potentially the tribal court, because my understanding is

7    that there is going to likely be a protection order for the

8    victim in this case, separate and apart from these

9    proceedings, for her lifetime, and it would protect her

10   residence and things like that.

11       And I understand the defendant's son lives there, so I

12   think that there will be some -- it's going to be somewhat

13   complicated, and I just want to put that on the record while

14   the defendant is here, that there's going to need to be

15   significant coordination as it relates to him having contact

16   with that child, should the sexual-deviancy provider permit

17   it.

18       THE COURT:  I think identifying those complexities is

19   good.  Of course, all should understand that there is the

20   tribal court, which also has jurisdiction over these matters,

21   so your comments are well-received here.

22       MS. LEE:  Thank you.

23       MR. BRENNAN:  Your Honor, with regard to the

24   sexual-deviancy therapist, I'm hoping that probation will be

25   receptive to Dr. Geoffroy, because it's really impacting his

1  ability to see his son.  So, if we can pick up where we left

2  off, it will be much easier than having to redo the whole

3  evaluation again, particularly because I'm quite confident

4  she's going to see no problem with him interacting with his

5  son unsupervised, so I guess that's just my request to

6  probation.

7       Secondly, we'd ask for the possibility of a split

8  sentence, and maybe that's not necessary in this situation.

9  The Court may have already decided against it.  He served

10 13 months.  The Court has imposed a sentence of 14 months.

11 With good-time credit, it's probably time served.

12      In talking with probation earlier, it looks like inpatient

13 treatment can be done very quickly, and I'm just concerned,

14 if this case goes to Texas for calculations, et cetera, we

15 may be delaying this more than is necessary.  So I don't know

16 if there's a way to do a split sentence for any remaining

17 term to be served in inpatient, which would accelerate the

18 process.

19           THE COURT:  He's been in custody since November 22nd

20 of last year, so it's been just about a year.  With good-time

21 credit, you're suggesting that he's eligible for release here

22 soon?

23           MR. BRENNAN:  Correct.

24           THE COURT:  Not quite yet, but that may not be

25 coinciding with identifying an inpatient program.

 1           MS. NEUMEISTER:  Correct, Your Honor.  And I think --
 2  I know that, with a split sentence, if an individual goes
 3  into the RRC or the Residential Reentry Center, they would be
 4  under the jurisdiction still of the Bureau of Prisons.  I
 5  don't know that that would be the case if he went into
 6  inpatient treatment, because it's not a Bureau of Prisons
 7  facility, so then it would put into question who would be
 8  supervising him for that time while he's in inpatient
 9  treatment, if he still, technically, has a little bit of time
10  left to serve.
11           THE COURT:  Well, it seems to me what might be in
12  order here is up to 120 days of the Residential Reentry
13  Center that's imposed by the Court now and to be released
14  once -- to an inpatient program.
15           MS. NEUMEISTER:  That would work, Your Honor.
16           THE COURT:  And he does need a place to reside, so
17  that's the Court's proposed solution here, is to add a
18  condition of up to 120 days of Residential Reentry Center, to
19  be released as soon as a residential inpatient treatment
20  program is identified and ready to receive him.
21           MR. BRENNAN:  Understood.
22      The Court actually brought up something I forgot to
23  request to be written in the judgment; that he be given
24  credit for the Neah Bay time.  The Court indicated that it's
25  been since --

1          THE COURT:  He should.

2          MR. BRENNAN:  I think he arrived in SeaTac in

3    November, if the Court's correct, but it was actually October

4    that he arrived in Neah Bay, so if the judgment could

5    reflect that.

6          THE COURT:  It should reflect the -- because he was

7    detained by the tribal facility for this offense; is that not

8    correct?

9          MS. LEE:  He was detained for this conduct, but it

10    had not yet been charged, and the federal system had not been

11    involved during that period of time, so it was the

12    Government's position that we would oppose that request.

13          THE COURT:  All right.  Well, I view it, if

14    incarcerated by another jurisdiction for the same conduct,

15    they didn't have the ability to charge this particular

16    offense, so the Court is going to give credit for the time

17    served in the tribal facility.

18        So that means, if he's eligible for time served now, that

19    the language should be -- the better approach here would be

20    time served, but not to be released until he can be released

21    to a Residential Reentry Center within the next 10 days,

22    something like that.

23        Officer Neumeister, isn't that the language typically --

24          MS. NEUMEISTER:  Yes, Your Honor, and I actually just

25    contacted my office and asked them to send me the specific

1    language so that we can incorporate it.

2         THE COURT:  All right.

3         MS. LEE:  I just want to be clear, Your Honor, as to

4    the term of custody, the Court would like me to put, in terms

5    of imprisonment, "credit for time served;" is that correct?

6         THE COURT:  If essentially that's what we're talking

7    about, then it avoids a problem with the FDC, yes.

8       So if you can work up all the other provisions that we've

9    talked about here while waiting for probation for the

10   language with respect to the Residential Reentry Center.

11        MS. LEE:  Your Honor, can I also readdress the

12   condition of contact with children?  I wonder if the Court

13   might limit that to his own biological children, or is the

14   Court intending to permit contact with all children under the

15   age of 18 if accompanied and supervised by an adult?

16      I would ask that there be a carveout for his own

17   biological children if accompanied and supervised by an adult

18   and approved, but that, given the nature of the offense, it

19   would be appropriate that there be a limitation on contact

20   with minors.

21        THE COURT:  I'm going to stick with the language that

22   it is going to depend upon the sexual-deviancy treatment

23   provider's recommendation to the probation department.

24        MS. LEE:  All right.  So I have added an asterisk

25   with the language:  "This condition is subject to change and

1   modification based upon input from U.S. Probation and the

2   treatment provider."  Is that --

3           THE COURT:  That will work.

4           MS. LEE:  Pardon?

5           THE COURT:  That would work.

6           MS. LEE:  Okay.  Your Honor, I've written in Special

7   Condition 11 the language that's been provided by U.S.

8   Probation.  It reads:  "The defendant shall reside in and

9   satisfactorily participate in a Residential Reentry Center

10  program as a condition of supervised release or probation for

11  up to 120 days or until discharged by the program manager or

12  U.S. Probation Office.  The defendant may be responsible for

13  a 25 percent gross income subsistence fee," for purposes of

14  the victim and her family.  Those locations where he can be

15  placed are in Seattle or Tacoma, based upon bed availability.

16          THE COURT:  All right.  And the language with respect

17  to up to -- usually, when I do a time served and I want them

18  going directly to the RRC, there's language to that effect.

19          MS. NEUMEISTER:  Yes.  We do usually have that

20  language, Your Honor.  It was not provided to me, but I think

21  that we can certainly come up with that ourselves.  So I

22  think it's --

23          MS. LEE:  "Released directly to"?

24          MS. NEUMEISTER:  Yeah, I think that would be

25  sufficient.

1    And, then, Your Honor, did you also want him to remain in

2    the halfway house until an inpatient bed is available or --

3            THE COURT:  I do.

4            MS. NEUMEISTER:  So maybe add that, as well.

5            MS. LEE:  Your Honor, both parties have reviewed the

6    judgment and believe it comports with this Court's oral

7    ruling.

8    May I approach?

9            THE COURT:  Yes.

10           MS. LEE:  Thank you.

11           THE COURT:  To be "released only to Residential

12   Reentry Center.  See Special Condition 11."

13   Is there a time limit that's usually imposed on that?

14           MS. NEUMEISTER:  I believe it's within 10 days.  I

15   think we're required to obtain placement within 10 days of

16   sentencing, Your Honor.

17           THE COURT:  And if you can't, then some other --

18           MS. NEUMEISTER:  I think they're released into the --

19           THE COURT:  Right.

20   So do the parties object to my adding here, "released only

21   to Residential Reentry Center within 10 days of today's

22   date"?

23           MS. LEE:  No objection, Your Honor, no.

24           MR. BRENNAN:  No objection, Your Honor.

25           THE COURT:  Officer Neumeister, this asterisked

footnote reads:  "The United States Probation Office shall

determine if this evaluation is sufficient."

If it determines it's insufficient, I would expect what

would happen would be a request for a modification, and we

would come back before the Court and take up the concern that

this is inadequate and that probation has identified a

different treatment provider.

MS. NEUMEISTER:  Yes, Your Honor.  I will make a note

of that.

THE COURT:  I find that the judgment, then, as

prepared, conforms to the sentence imposed, so I am signing

it.

Mr. Colfax, you have the right to appeal this conviction

and this sentence.  If you were to do it, you'd have to do it

within 14 days of today's date.  Mr. Brennan would assist you

with that.

You have a lot of hard work to do in order to be the

person that this Court wants to see, safe in the community,

clean and sober.

Is there anything else?

MS. LEE:  No, Your Honor.  Thank you.

MR. BRENNAN:  Nothing, Your Honor.

THE COURT:  We'll be in recess.

(Adjourned.)

0

C E R T I F I C A T E

    I, Sheri L. Schelbert, RMR, CRR, do certify that the foregoing is a correct transcript, to the best of my ability, from the record of proceedings in the above-entitled matter.

*/s/ Sheri Schelbert*

Sheri Schelbert